Elizabeth RIVERA Plaintiff,

v.

Gordon R. ENGLAND, in his capacity
as the Secretary of the Navy;
Defendant.

No. CIV. 03–00142ACKBMK.

United States District Court,
D. Hawaiʻi.

Feb. 17, 2005.

Clayton C. Ikei, Jerry P.S. Chang, Honolulu, HI, for Elizabeth Rivera, plaintiff.

Matthew J. Rinka, Office of the United States Attorney, Mark J. Mellett, Office of the U.S. Attorney, Special Assistant U.S. Attorney, Thomas A. Helper, Office of the United States Attorney, Honolulu, HI, for Hansford T. Johnson, Navy, Acting Secretary of the, in his capacity as, Gordon R. England, in his capacity as the Secretary of the Navy, defendants.

*ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS FOR FAILURE TO TIMELY EXHAUST ADMINISTRATIVE REMEDIES AND MOTION FOR SUMMARY JUDGMENT*

KAY, District Judge.

### FACTUAL BACKGROUND

This lawsuit involves an employment dispute between Plaintiff Elizabeth Rivera ("Plaintiff" or "Rivera") and her employer Defendant Gordon R. England, Secretary of the Navy, or more specifically, the Office of General Counsel ("OGC"), Department of the Navy. The OGC is an organization that provides legal services to the Department of the Navy comprised of approximately 580 civilian attorneys that are located primarily in Washington D.C. but also with offices throughout the United States and overseas. *See* Plt's Opp. at 2.

Rivera, a female of Filipino ancestry, is currently an employee of the Naval Supply Systems Command ("NAVSUP"), a division of OGC which is headquartered in Mechanicsburg, Pennsylvania, as a GS–14 Attorney Advisor/Counsel assigned to the Fleet Industrial Supply Command Pearl Harbor ("FISC Pearl Harbor") at the Pearl Harbor Naval Base. *See* Def.'s Mot. at 1, Plt.'s Opp. at 2. "Command Counsel" heads NAVSUP assisted by "Deputy Counsel." *See* Ex. B to Plt's Concise Statement of Facts, filed 11/18/04 ("Plt.'s CSF"). The next tier of NAVSUP leadership is placed in various "Associate Counsel" followed by "Counsel." Under "Counsel," there are assistant counsels and support staff. *See id.*

Rivera first started providing legal services to FISC Pearl Harbor in March of 1984[1] at the GS–12 level. Rivera Decl., 11/18/04, ("Rivera Decl.") at ¶ 11.[2] She describes her then-duties as including the provision of legal advice in procurement law, A–76 studies, fiscal law, Freedom of Information Act/Privacy Act ("FOIA"), ethics and other matters. *See id.* at ¶ 12, 13. She states that she litigated contract issues and claims in various tribunals. *See id.*

In May 1987, Rivera was appointed to the position of "Counsel" and promoted to the grade of GS–13. *See id.* at ¶ 13. She

---

1. At that time, FISC Pearl Harbor was known as the Naval Supply Center.

2. Plaintiff graduated from the Georgetown University Law Center in 1980. Prior to her position at FISC Pearl Harbor, she worked as a deputy attorney general for the Department of the Attorney General, State of Hawaii (1981–1982), a Special Assistant U.S. Attorney for the U.S. Attorney's Office in Hawaii (1982–1983), and an associate attorney with the private law firm Dinman and Yokoyama (1983–1984). *See* Rivera Decl. at ¶¶ 8–10.

was later promoted to GS–14 in January of 1989. *See id.* at ¶ 14. Rivera describes her duties as Counsel as including provision of "legal advice in procurement law, A–76 studies, fiscal law, environmental law, real estate, civilian personnel law, Freedom of Information/Privacy Act, and ethics." *Id.* at ¶ 15. As Counsel, she provides services to clients "Commanding Officer ("CO"), Executive Officer ("XO"), Executive Director ("ED"), department heads, and contracting personnel" at FISC Pearl Harbor. *Id.* at ¶ 15. Under NAVSUP's organizational structure, Rivera's immediate supervisor is an Associate Counsel while her second level and third level supervisors are the Deputy Counsel and the Command Counsel, respectively.

Rivera's performance was formally evaluated by her superiors on an annual basis for at least the years 1997 through 2001. *See* Exs. C–E to Plt.'s CSF.; Exs. D–E to Def.'s Concise Statement of Facts, filed 7/07/04 ("Def.'s CSF"). Rivera's evaluations are signed by her immediate supervisor, and in some cases, by her second level supervisor as well. *See id.* It appears that Associate Counsel, in preparing Rivera's annual evaluations, solicited comments from Rivera's clients regarding her performance for each review period. *See id.*

For the period covering July 1, 1996 to June 30, 1997, Rivera received the highest Level 5 "outstanding" rating, on a scale that rated Level 1 as "unacceptable," Level 2 as "minimally successful," Level 3 as "fully successful," and Level 4 as "exceeds fully successful." *See* Ex. C to Plt.'s CSF. On or about July 7, 1997, then-CO Bob Nanney ("CO Nanney") commented that "she has earned the VERY HIGHEST RANKING POSSIBLE in terms of contri-

butions to mission and performance!" *Id.* Subsequently, on or about September 4, 1997, Associate Counsel Otto Thompson wrote that Rivera's "performance has been outstanding in all respects." *Id.*

For the period covering July 1, 1997 to June 30, 1998, Rivera again received the highest Level 5 "outstanding" rating. *See* Ex. D to Plt.'s CSF. For this review period, CO Nanney remarked on or about June 21, 1998 that "Ms. Rivera has greatly exceeded all measures of performance, and has provided customer service at a higher level than I have seen in my 23 years of service." *Id.* On or about July 8, 1998, Associate Counsel Sandra Jumper wrote that Rivera's "overall performance was OUTSTANDING." *Id.* On or about August 24, 1998, Command Counsel Diane Townsend ("Townsend") sent Rivera a memorandum regarding her "OUTSTANDING PERFORMANCE APPRAISAL." *See id.* In part, the memorandum stated "Please accept my congratulations for the excellent legal services you provided in support of the Navy." *Id.*

For the period covering July 1, 1998 to June 30, 1999, Rivera received an "acceptable" rating on a rating scale of "acceptable" and "unacceptable." [3] *See* Ex. E to Plt.'s CSF. An "acceptable" rating indicates "performance rated 'successful' or 'above successful' on all elements" and an "unacceptable" rating means "performance rated 'unsuccessful' on one or more elements." *Id.* Rivera received a mid-level "Successful" rating—on a rating system of "Unsuccessful," "Successful" and "Above Successful"—on all critical elements and standards [4] and "Accomplished" ratings—on a rating system of "Accomplished" or "Unaccomplished"—on all Work Plan ob-

---

**3.** In 1999, the Navy changed its evaluation rating scale from a five (5–outstanding, 4–exceeds fully successful, 3–fully successful, 2–minimally successful, and 1–unacceptable) to a two level (acceptable or unacceptable) system. *See* Rivera Decl. ¶ 32.

**4.** Critical elements and standards include: Execution of duties, organizational support,

jectives. On or about July 21, 1999, in a memorandum addressed to Townsend, then-CO Gidget Caldwell ("CO Caldwell") rated "Rivera's performance as 'above successful' in all critical elements and as 'Accomplished' in all work plan objectives." *Id.* CO Caldwell, in closing, stated "I most strongly recommend Ms. Rivera for additional recognition to highlight her invaluable service to the Navy and the nation." *Id.* Associate Counsel Jumper's ("Jumper") written comments were less complimentary than that noted the previous year, but nevertheless positive overall. *See id.* ("Overall, Ms. Rivera continues to provide tremendous support to her subordinate and participates in the NAVSUP OGC activities, including the West Coast and May conferences."). Among other things, she wrote that Rivera was "[u]ndoubtedly ... juggling a complex workload consisting of A–76 issues and its accompanying ethics issues." *Id.* Jumper also noted that this period was marked by "low morale and significant personnel turnover within the FICSPH, coupled with limited budgets and experienced [sic] manpower." *Id.*

For the period from July 1, 1999 to June 30, 2000, Rivera again received an "Acceptable" rating. *See* Ex. D to Def.'s CSF. Like the previous year, she was given the mid-level "Successful" rating on all critical elements and standards and "Accomplished" ratings on all Work Plan objectives. *See id.* The undated written comments [5] given by Associate Counsel Michael Rossiter ("Rossiter") are generally unfavorable and suggest that the CO [6]

also provided negative comments regarding Rivera's performance for this period. *See id.* ("It was noted and discussed with her [Rivera] at the time of the Command Assessment in April 2000 that the Command desired her engagement and contribution to the business of the Command and in the broader management issues facing it."). In closing, Rossiter wrote "The goal is to have Office of Counsel viewed as adding value to the work of the client and not viewed as a necessary hurdle in the process."

For the period from July 1, 2000 to June 30, 2001, Rivera again received an "Acceptable" rating. *See* Ex. E to Def.'s CSF. Like the previous two years, she was given "Successful" ratings on all critical elements and standards and "Accomplished" ratings on all objectives. *See id.* The undated written comments [7] by Rossiter regarding Rivera's performance were again negative in tone. *See id.* ("Your performance during the rating period has been ACCEPTABLE. However, many areas of your performance were marginal, at best."). By letter dated January 10, 2002, Rossiter provided "Additional Feedback for Performance Period 1 July 2000 to 30 June 2001" ("Additional Feedback Letter"). The letter stated reasons for why Rivera's performance in several instances during the review period were unacceptable notwithstanding her receipt of an overall "Acceptable" rating. *See* Ex. N to Plt.'s CSF. By letter of the same date (January 10, 2002), Rossiter also wrote Rivera regarding "Progress Review and Letter of Cau-

---

communication, personnel management, equal employment opportunity, and work plan. *See, e.g.,* Ex. E to Plt.'s CSF.

**5.** Rossiter signed the final appraisal box of Rivera's evaluation for this period but did not date it. Notably, Rivera's signature in the final appraisal box is dated February 2, 2001, approximately eight months after the end of the period reviewed.

**6.** Direct Comments by the CO are not provided by the parties for this review period.

**7.** Rossiter signed Rivera's evaluation on January 11, 2002, notably half a year after the end of the evaluation period. *See* Ex. E to Def.'s CSF.

tion" ("Letter of Caution") including with the letter an enclosure regarding "requirements for successful performance." *See* Ex. "O." The Letter of Caution listed specific examples of Rivera's "performance deficiencies for the period of 1 July 2001 to 30 December 2001," and expressly stated "[t]his is not a disciplinary action. It will not be filed in your official personnel folder, but will be retained in office files." *Id.*

A number of other events significant to this dispute occurred in 2000 and 2001. First, Rivera states that upon inquiry in April of 2000, Rossiter confirmed that there "was a plan to have all heads of offices or Counsel be GS–0905–15," but that in May of 2000, Townsend informed her that she would not be promoted. Rivera Decl. ¶ 63.

Also, in March 2000, Rivera began interviewing applicants for the position of Assistant Counsel.[8] *See* Rivera Decl. ¶ 44. She recommended Edwin Nacino, a male of Filipino ancestry, for the position. *See id.* ¶ 45. Over Rivera's objection, however, Townsend selected another applicant Lori Chang ("Chang"), a female of Chinese ancestry. *See* Rivera Decl. ¶¶ 45–47, Ex. Y to Plt's CSF at 51:13–52: 21. Based on her interview with Chang, Rivera's impression of Chang was that Chang was only interested in what she could get and in people who could help her get ahead. *See* Rivera Decl. ¶ 46.

Chang started as Assistant Counsel in July 2000. *See id.* at 55. At about that time, Townsend told Rivera that Rossiter, not Rivera, would be Chang's supervisor. *See* Rivera Decl. ¶ 55; Ex "X" at 51: 10—53: 12. Rivera's understanding of her role with respect to Chang was that she was a supervisor in all respects except that she would not do Chang's performance evalua-

tion. *See* Rivera Decl. ¶ 55. Chang reported negative comments regarding events that occurred as early as July 2000 directly to Rossiter. *See* Rivera Decl. ¶ 55; *see also* Exs. J–L to Plt.'s CSF.

On April 24, 2001, Rivera met with an Equal Employment Opportunity ("EEO") Counselor for the first time. *See* Ex. "A" to Def.'s CSF at 13. She filed a Formal Complaint of Discrimination on November 6, 2001 alleging: (1) denial of opportunity for promotion to GS–0905–15 from GS–0905–14 on the basis of race (Filipino) and sex (female), (2) removal of supervisory duties over assistant counsel on the basis of race and sex, and (3) receipt of two performance evaluations (July 1998–June 1999 and July 1999 -June 2000) with negative comments on the basis of race and sex. *See id.* at 7–11. On or about March 12, 2002, OGC issued a "Partial Acceptance—Dismissal of Discrimination Complaint for Elizabeth Rivera v. Gordon R. England, Secretary of Navy, Docket Number DON 02–00023–001" whereby all but Rivera's failure to promote claims were dismissed as untimely. *See* Ex. "B" to Plt.'s CSF. Rivera filed another Formal Complaint of Discrimination on June 12, 2002 this time alleging the following acts of discrimination on the basis of race (Filipino), sex (female), and reprisal (EEO Complaint filed April 24, 2001):(1) receipt of a performance evaluation (July 2000–June 2001) and Additional Feedback Letter containing derogatory information, and (2) receipt of the Letter of Caution. *See* Ex. "C" to Def.'s CSF.

On March 28, 2003, Rivera filed the Complaint in this action alleging discrimination in violation of 42 U.S.C. § 2000e–1, et seq. ("Title VII") based on the same allegations contained in her November 6,

---

8. Rivera's initial request in October 1999 that the paralegal position (vacant at the time) be converted to an assistant counsel position was denied by CO Caldwell. *See* Rivera Decl. ¶ 41. CO Caldwell subsequently gave approval to advertise for an assistant counsel. *See id.* at ¶ 42.

2001 and June 12, 2002 Formal Complaints of Discrimination ("Complaint"). Defendant filed the instant Motion to Dismiss for Failure to Timely Exhaust Administrative Remedies and Motion for Summary Judgment on July 7, 2004 (the "Motion"). Plaintiff filed a Memorandum in Opposition to the Motion on November 18, 2004 ("Opposition"). On November 24, 2004, the parties filed a stipulation[9] to continue the hearing on the Motion to February 14, 2005. Defendant replied on December 2, 2004. The Court heard oral argument on the Motion on February 14, 2005.

### STANDARD OF REVIEW

### I. MOTION TO DISMISS

■ Under Federal Rule of Civil Procedure 12(b)(6), in evaluating a motion to dismiss for failure to state a claim upon which relief can be granted, this Court must accept as true the plaintiff's allegations contained in the complaint and view them in a light most favorable to the plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Wileman Bros. & Elliott, Inc. v. Giannini*, 909 F.2d 332, 334 (9th Cir.1990); *Shah v. County of Los Angeles*, 797 F.2d 743, 745 (9th Cir.1986). Thus, the complaint must stand unless it appears beyond doubt that the plaintiff has alleged no facts that would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1988). A complaint may be dismissed as a matter of law for two reasons: (1) lack of a cognizable legal theory or (2) insufficient facts under a cognizable legal theory. *Balistreri*, 901 F.2d at 699; *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 533–34 (9th Cir.1984).

In essence, as the Ninth Circuit has stated, "[t]he issue is not whether a plaintiff's success on the merits is likely but rather whether the claimant is entitled to proceed beyond the threshold in attempting to establish his claims." *De La Cruz v. Tormey*, 582 F.2d 45, 48 (9th Cir.), *cert. denied*, 441 U.S. 965, 99 S.Ct. 2416, 60 L.Ed.2d 1072 (1979). The Court must determine whether or not it appears to a certainty under existing law that no relief can be granted under any set of facts that might be proved in support of plaintiff's claims. *Id.*

■ A motion under Rule 12(b)(6) should also be granted if an affirmative defense or other bar to relief is apparent from the face of the Complaint, such as lack of jurisdiction or the statute of limitations. 2A J. Moore, W. Taggart & J. Wicker, *Moore's Federal Practice*, ¶ 12.07 at 12–68 to 12–69 (2d ed.1991 & supp. 1191–92) (citing *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976)).

### II. MOTION FOR SUMMARY JUDGMENT

■ The purpose of summary judgment is to identify and dispose of factually unsupported claims and defenses. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is therefore appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."[10] Fed. R.Civ.P. 56(c).

---

**9.** The parties previously stipulated to continue the hearing on the Motion on August 5, 2004 and September 14, 2004 and

**10.** Affidavits made on personal knowledge and setting forth facts as would be admissible at trial are evidence that a court may consider when determining whether a material issue of

"A fact is 'material' when, under the governing substantive law, it could affect the outcome of the case. A genuine issue of material fact arises if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" [11] *Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n*, 310 F.3d 1188, 1194 (9th Cir.2002) (quoting *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1523 (9th Cir.1994)) (internal citations omitted). Conversely, where the evidence "could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

The moving party has the burden of persuading the Court as to the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. The moving party may do so with affirmative evidence or by "'showing'—that is pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. 2548. All evidence and reasonable inferences drawn therefrom are considered in the light most favorable to the nonmoving party. *See, e.g., T.W. Elec. Serv. v. Pac.*

*Elec. Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir.1987). So, too, the Court's role is not to make credibility assessments. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Accordingly, if "reasonable minds could differ as to the import of the evidence," summary judgment will be denied. *Id.* at 250–51, 106 S.Ct. 2505.

Once the moving party satisfies its burden, however, the nonmoving party cannot simply rest on the pleadings or argue that any disagreement or "metaphysical doubt" about a material issue of fact precludes summary judgment. *See Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548; *Matsushita Elec.*, 475 U.S. at 586, 106 S.Ct. 1348; *Cal. Arch. Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir.1987). Nor will uncorroborated allegations and "self-serving testimony" create a genuine issue of material fact. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir.2002); *see also T.W. Elec. Serv.*, 809 F.2d at 630. The nonmoving party must instead set forth "significant probative evidence" in support. *T.W. Elec. Serv.*, 809 F.2d at 630. Summary judgment will thus be granted against a party who fails to demonstrate facts sufficient to establish an element essential to his case when that party will ultimately bear the burden of proof at trial.[12] *See Celotex*, 477 U.S. at 322, 106

---

fact exists. Fed.R.Civ.P. 56(e). Legal memoranda and oral argument are not evidence and do not create issues of fact. *See British Airways Bd. v. Boeing Co.*, 585 F.2d 946, 952 (9th Cir.1978).

**11.** Disputes as to immaterial issues of fact do "not preclude summary judgment." *Lynn v. Sheet Metal Workers' Int'l Ass'n*, 804 F.2d 1472, 1478 (9th Cir.1986).

**12.** When the moving party also has the burden of proof in an element of a claim, it has the "burden of establishing a prima facie case on the motion for summary judgment." *UA Local 343 of the United Ass'n of Journeymen v.*

*Nor–Cal Plumbing, Inc.*, 48 F.3d 1465, 1471 (9th Cir.1994). Upon showing a prima facie case, the burden of production shifts and it becomes "incumbent on [the nonmoving party] to 'set forth specific facts showing that there is a genuine issue for trial,' by evidence cognizable under that rule." *Id.* (quoting Fed.R.Civ.P. 56(e)); Charles A. Wright *et al.*, Federal Practice & Procedure § 2727 (3d ed.1998). The ultimate burden of persuasion as to the non-existence of any genuine issues of material fact remains on the moving party. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir.2000); *accord Dye v. United States*, 121 F.3d 1399, 1409 (10th Cir.1997).

S.Ct. 2548.

## DISCUSSION

## I. FAILURE TO EXHAUST ADMINIS-
## TRATIVE REMEDIES

Defendant argues that Plaintiff failed to exhaust her administrative remedies with respect to three of the alleged acts of discrimination:

(1) the July 1998 to June 1999 evaluation,

(2) removal of supervisory duties in July 2000, and

(3) the July 1999 to June 2000 evaluation.

According to Defendant, Plaintiff first contacted an EEO counselor with respect to these allegedly discriminatory acts on April 24, 2001, outside of the 45–day time limitation set forth in 29 C.F.R. § 1614.105(a)(1), which provides in relevant part:

(a) Aggrieved persons who believe that they have been discriminated against on the basis of race ... sex ... must consult a Counselor prior to filing a complaint in order to try to informally resolve the matter.

(1) An aggrieved person must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action.

"A discrimination complaint is timely only if the complainant has contacted an EEO counselor 'within 45 days of the date of the matter alleged to be discriminatory.'" Swenson v. Potter, 271 F.3d 1184 (9th Cir.2001). When "a plaintiff pursues several disparate treatment claims, based on discrete discriminatory acts, the limitations period will begin to run for each individual claim from the date on which the underlying act occurs." Lyons v. England, 307 F.3d 1092, 1106–07 (9th Cir. 2002).

■ Plaintiff concedes that the July 1998 to June 1999 evaluation and Plaintiff's removal of her supervisory duties with respect to associate counsel in July 2000 are not timely and should be dismissed. See Plt's Opp. at 6. She argues, however, that her allegedly discriminatory July 1999 to June 2000 performance evaluation should not be dismissed for untimeliness because it did not become final until March 15, 2001, the date on which Rossiter refused to change it. See id. at 7–8.

The Court finds that Plaintiff has not met the requirements of 29 C.F.R. § 1614.105(a)(1) with respect to her July 1999 to June 2000 performance evaluation. First, Plaintiff does not allege in the Complaint that she indeed requested Rossiter to reconsider his negative comments. Second, even if she had made such an allegation, the true "matter alleged to be discriminatory," is the underlying comments made by Rossiter in her performance evaluation, not his subsequent refusal to change them. See Swenson, 271 F.3d at 1191; cf. Lever v. Northwestern Univ., 979 F.2d 552, 556 (7th Cir.1992) ("An employer's refusal to undo a discriminatory decision is not a fresh act of discrimination..... An applicant does not have to sue about the first wrong to be entitled to contest a second. But when the first decision is connected to and implies the second-when, in other words, a single discriminatory decision is taken, communicated, and later enforced despite pleas to relent, the time starts with the initial decision.") (citations omitted). There is no allegation or suggestion by Plaintiff that the Navy's evaluation process included an appeal procedure or that Rossiter was obligated to respond to her request for reconsideration. See Boyd v. United States Postal Svc., 752 F.2d 410, 414 (9th Cir.1985) (rejecting argument that matter not final based on continuing correspondence between the Postmaster General and Senator that in no

way promised Postmaster General would personally review merits of plaintiff's application for reinstatement). Indeed, Rivera's signature dated 2/2/01 is placed in a box identified item "9. FINAL APPRAISAL." Ex. "D" to Def.'s CSF. Plaintiff's interpretation of the triggering of the 45–day limitations period would lead to the implausible conclusion that she could challenge her July 1999 to June 2000 evaluation at any time of her choosing if Rossiter had simply failed to respond to her request that he reconsider his decision. Finally, Plaintiff's counsel conceded at the hearing on the Motion that based on Ninth Circuit law, her claim is time-barred as the evaluation "occurred," and/or became "effective," no later than her receipt of it on February 2, 2001. *See Lyons,* 307 F.3d at 1106–07 ("the limitations period will begin to run for each individual claim from the date on which the underlying act occurs").

Accordingly, the Court dismisses Plaintiff's discrimination claim based on the (1) July 1998 to June 1999 evaluation, (2) removal of Plaintiff's supervisory duties and (3) July 1999 to June 2000 performance evaluation as untimely.

## II. SUMMARY JUDGMENT ON REMAINING CLAIMS

Defendant next argues that summary judgment should be granted in its favor on Plaintiff's remaining claims, which Defendant lists as:

1. From 1 May 2000 to 15 March 2001 Plaintiff was not promoted from GS–14 to a GS–15 in her current position as Counsel at FISC Pearl Harbor.

2. On or about January 11, 2002,
 i. Plaintiff received a rating of "pass and satisfactory" on her performance evaluation for the performance period of July 2000 to June 2001.
 ii. Plaintiff was provided a memorandum entitled "Additional Feedback for Performance Period July 1, 2000 to June 30, 2001" date 10 January 2002.
 iii. Plaintiff received a memorandum titled "Progress Review and Letter of Caution."

Def.'s Mot. at 9. In opposition, Plaintiff argues and submits evidence in support of her failure to promote and retaliation claims. *See* Plt.'s Opp. at 8–27.

### A. *Failure to Promote*

Both parties analyze Plaintiff's failure to promote claim within the framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under *McDonnell Douglas,* "a plaintiff may prove his case through circumstantial evidence by showing that (1)[s]he belongs to a statutorily protected class, (2)[s]he applied for and was qualified for an available position, (3)[s]he was rejected despite h[er] qualifications, and (4) after the rejection, the position remained available and the employer continued to review applicants possessing comparable qualifications." *Lyons,* 307 F.3d at 1112; *see also Bergene v. Salt River Project Agricultural Improvement & Power District,* 272 F.3d 1136 (9th Cir.2001) ("To state a prima facie case of discrimination, a plaintiff must show (1) she belongs to a protected class, (2) she was performing according to her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) other employees with qualifications similar to her own were treated more favorably."). On a summary judgment motion, "the 'requisite degree of proof necessary to establish a prima facie case is minimal and does not even need to rise to the level of a preponderance of the evidence.'" *Id.*

A presumption that the employer unlawfully discriminated against the employee

arises if the prima facie case is established. *See id.* "The burden of production then shifts to the employer to articulate a legitimate, non-discriminatory reason for the plaintiff's rejection." *Id.*

Finally, if the employer sustains its burden, the plaintiff must then show that "the proffered nondiscriminatory reason is merely a pretext for discrimination." *Id.* Pretext can be proven either "(1) indirectly, by showing that the employer's proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable or (2) directly, by showing that unlawful discrimination more likely motivated the employer." *Id.*

 The Ninth Circuit recognizes a need for a flexible approach to the *McDonnell Douglas* framework. *See Hagans v. Andrus,* 651 F.2d 622, 625 (9th Cir.1981) (citing *White v. City of San Diego,* 605 F.2d 455, 458 (9th Cir.1979), for the proposition that "a proper prima facie case identifies sex as the likely reason for the denial of a job opportunity"); *see also Lyons,* 307 F.3d at 1114 ("[t]he Supreme Court has cautioned that 'the prima facie case method established in McDonnell Douglas was 'never intended to be rigid, mechanized, or ritualistic.'") (citation omitted). Also, while the

> McDonnell Douglas burden shifting framework is a useful 'tool to assist plaintiffs at the summary judgment stage so that they may reach trial,' 'nothing compels the parties to invoke the McDonnell Douglas presumption.' Rather, when responding to a summary judgment motion the plaintiff is presented with a choice regarding how to establish his or her case. [The plaintiff] may proceed by using the McDonnell Douglas framework, or alternatively, may simply produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated [the defendant].

*McGinest v. GTE Service Corp.,* 360 F.3d 1103, 1122 (9th Cir.2004). Under either approach, the plaintiff "must produce some evidence suggesting [the defendant's] failure to promote … was due in part or whole to discriminatory intent, and so must counter [the defendant's] explanation that a [legitimate reason] accounted for its failure to promote[.]" *Id.* at 1123.

**1. Prima Facie Case of Discrimination Based on Failure to Promote**

Defendant contends that Plaintiff fails to make a prima facie case of failure to promote because she cannot show that she was/is as qualified or better qualified than those who were promoted during the relevant time period. Defendant argues that Plaintiff's poor work history, i.e. failure to handle workload and deficient performance on certain specific cases, prevents her from establishing the second and fourth prongs of the prima facie case. *See* Def.'s Mot. at 10–17.

Plaintiff, on the other hand, maintains that she was/is qualified for the position. Plaintiff presents evidence to show, among other things, that she has more than twenty years of government law experience, including serving as Counsel since May 1987, and has received various awards and commendations during her tenure. *See* Rivera Decl. ¶ 18–29. Additionally, Plaintiff attaches several evaluations for periods from 1997 through 1999 that contain extremely positive comments regarding the quality of her work and overall performance. *See* Exs. C–E to Plt.'s CSF. It is clear that Plaintiff feels that she is as qualified as the Counsel of other offices who received promotion to the GS–15 level. *See* Rivera Decl. ¶ 62–64; *see also* Exs. C–E to Plt.'s CSF (self evaluations). Plaintiff also presents evidence of various instances of alleged discrimination by the Navy, in particular, Damon Martin, an African–American male OGC lawyer in a di-

vision comparable to but separate from NAVSUP, who was denied promotion to the GS–15 level even though his client supported his promotion and he received favorable performance ratings. *See* Rivera Decl. ¶ 65–69; *see also* Ex. S to Plt.'s CSF.

In response, Defendant insists that the other lawyers that were promoted to the GS–15 level were not similarly situated because they did not have a record of negative performance evaluations and documented problems. *See* Def.'s Reply at 5–8. Defendant also points out that CO Caldwell did not support Plaintiff's promotion to the GS–15 level and that CO Caldwell's support was a prerequisite. *See* Def.'s Reply at 6–7. In summary, Defendant contends that "plaintiff's failure to compare herself to the successful candidates for promotion dooms her attempt to establish the fourth element of the *prima facie* case." Def.'s Reply at 7.

■ With respect to the second prong [13] of the prima facie case, the Ninth Circuit instructs that where, as here,[14] "the employer has not published the qualifications for positions that were awarded without a competitive application process, it would be unreasonable to require a plaintiff to present direct evidence of the actual job qualifications as part of his prima facie case." *Lyons*, 307 F.3d at 1114. The Court finds that the evidence provided by Plaintiff discussed above, in particular her substantial years of service at the Counsel position, satisfies her "minimal burden of showing qualification at the initial stage of the McDonnell Douglas burden-shifting rationale." *Id.* (discussing qualification

based on position of Program Manager and self assessment of performance).

■ As stated in *Lyons*, the fourth prong of the *McDonnell Douglas* prima facie case requires Plaintiff to show that "after the rejection, the position remained available and the employer continued to review applicants possessing comparable qualifications." *Id.* at 1112. This statement of the fourth prong does not mesh well with the factual circumstances of this failure to promote case in that Plaintiff does not contend that other persons are competing for the specific promotion she seeks, but rather, that she should be promoted just as others holding the position of Counsel have. The fourth prong stated in *Bergene*—"other employees with qualifications similar … were treated more favorably"—appears more applicable here. 272 F.3d at 1140. Though not specifically adopted by the Ninth Circuit, the Court may also consider whether the evidence shows that "the supervisory level employees having responsibility to exercise judgment under the promotion system betrayed in other matters a predisposition towards discrimination against members of the involved minority." *Hagans*, 651 F.2d at 625–26 n. 4 (citing *Pettit v. United States*, 203 Ct.Cl. 207, 488 F.2d 1026, 1033 (Ct.Cl.1973)).

■ The Court finds that Plaintiff has sustained her "minimal burden" with respect to the fourth prong. *See Lyons*, 307 F.3d at 1113 ("We have said that the amount of evidence required at the summary judgment stage is 'very little' and does not rise to the level of a preponder-

---

**13.** Neither party argues that the first and/or third requirements of the *McDonnell Douglas* prima facie case are not fulfilled.

**14.** Plaintiff alleges that Rossiter did not disclose the goals or objectives of promotion to GS–15 as of March 15, 2001. Rivera Decl. ¶ 63; *see also* Ex. Q to Plt.'s CSF ("He [Rossi-

ter] told her that there were no goals/objectives for becoming a GS–15 and that the circumstances of each Office are different."). At the hearing on the Motion, defense counsel confirmed that the requirements for non-competitive promotion to GS–15 are not published.

ance of the evidence."). Plaintiff has produced evidence that the OGC heads of office that were promoted to the GS–15 level during the time Plaintiff sought promotion are invariably Caucasian (two males and one female), hold duties similar to hers, and carry comparable, if not less burdensome, workloads. *See* Rivera Decl. ¶ 39, 62, 64. Rivera also produced evidence that indicates that as of May 2000 all NAVSUP Counsel at the GS–15 level are Caucasian (eight males and one female), while in May 1997, only one GS–15 level Counsel (male African–American) was not Caucasian. *See* Rivera Decl. ¶ 37. Plaintiff also pointed out that all 19 attorneys either hired or promoted by NAVS-UP in the years 1999–2001 were Caucasian, 13 Caucasian males and 6 Caucasian females. *See* Ex. G to Plt.'s CSF. As such, the Court finds that Plaintiff has set forth a prima facie case of race and gender-based discrimination.[15] *See Lam v. University of Hawaii,* 40 F.3d 1551, 1562 (9th Cir.1994) ("when a plaintiff is claiming race and sex bias, it is necessary to determine whether the employer discriminates on the basis of that combination of factors, not just whether it discriminates against people of the same race or of the same sex").

## 2. Legitimate Non–Discriminatory Reason For Failure to Promote

Defendant contends that Plaintiff's lack of qualification and poor work history is a legitimate non-discriminatory reason that Plaintiff was not promoted. *See* Def.'s Mot. at 17. As evidence of her poor work history, Defendant points to Plaintiff's performance evaluations for the years 1998,[16] 1999 and 2000. *See* Def.'s Mot. at 15–16. Defendant emphasizes that Townsend relied on the fact that CO Caldwell did not support her promotion to GS–15, and that Caldwell's lack of support was fatal to Plaintiff's application. *See* Mot. at 17. Plaintiff argues that the reasons supplied by Defendant for denying her promotion to GS–15, specifically those stated in the November 7, 2002 Report of Investigation attached as Exhibit Q[17] to Plaintiff's CSF, are pretextual. *See* Plt.'s Opp. at 13–19.

## 3. Pretext

As stated above, pretext can be proven either "(1) indirectly, by showing that the employer's proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable or (2) directly, by showing that unlawful discrimination more likely motivated the employer." *Lyons,* 307 F.3d at 1113. While circumstantial evidence of pretext must be "specific and substantial" in order to survive summary judgment, "any indication of discriminatory motive may suffice to raise a question that can only be resolved by a factfinder." *Id.*

The Court finds that the evidence produced in connection with the Motion sufficiently raises a question of fact regarding Defendant's allegedly discriminatory motive. The statistics presented are similar to the statistical evidence deemed

15. Plaintiff has not argued or presented evidence to show disparate treatment based on her July 2000 to June 2001 performance evaluation, the Additional Feedback Letter or the Letter of Caution. Accordingly, summary judgment is granted on Plaintiff's claims based on these alleged discriminatory acts (race and sex).

16. The Court notes that Plaintiff's performance evaluation for the period from July 1998

to June 1999 contains favorable written comments by both Jumper and CO Caldwell. *See* Ex. E to Plt.'s CSF.

17. At the hearing, defense counsel objected to the admissibility of Exhibit Q to Plaintiff's CSF. The Court notes that it does not rely on Exhibit Q in reaching the decisions stated in this Order.

sufficient in *Lyons* and not of the variety discussed in *Patterson v. U.S. Cold Storage,* No. 94–0014, 1995 WL 871333 (N.D.Cal. Mar. 28, 1995), relied on by Defendant. Here, Plaintiff produced evidence showing that the number of non-Caucasian GS–15 level NAVSUP Counsel has decreased from one in 1997 (African–American male) to zero in 2000. *See Lyons,* 307 F.3d at 1115–16 ("appellants have produced statistical evidence that the employer's policies have steadily removed African–American employees from GS–13 positions, resulting in their total removal from such positions in the year directly preceding the challenged promotion decisions"). Also, Plaintiff produced evidence to indicate that of the 19 total attorneys either hired or promoted by NAVSUP from 1999 to 2001, 13 were Caucasian males and 6 were Caucasian females and that as of 2000, no non-Caucasian female held a GS–15 NAVSUP Counsel position. *See* Ex. G to Plt.'s CSF; *see also McGinest,* 360 F.3d at 1124 (citing *Bergene,* 272 F.3d at 1143, for the proposition that "absence of female supervisors was one factor establishing pretext for failure to promote"). While Defendant argues that Plaintiff's statistical evidence is "incomplete, irrelevant and insubstantial," [18] Defendant does not challenge the accuracy of the figures provided. *See* Def.'s Reply at 13–16.

The Court also finds that the evidence shows, among others, material factual disputes regarding what the precise requirements for promotion to the GS–15 level are/were, and whether Plaintiff is/was as qualified as any of the other Caucasian Counsel promoted to the GS–15 level. *See Lyons,* 307 F.3d at 1117 ("Without indicating specific weaknesses in appellants' candidacies for promotion, appellee responds that appellants were not the best qualified applicants for any of the positions at issue. At summary judgment, 'our place is not to weigh the evidence or determine the truth of the matter, but only determine whether there is a genuine issue for trial.' **In such circumstances whether appellants were as qualified as any of the promotion recipients is a factually intensive question best resolved by the jury.**") (emphasis added). While Defendant claims that "Plaintiff's deficient performance was well known throughout upper management in the NAVSUP community [referring to Townsend, Gale and Rossiter,]" Def.'s Mot. at 16, Plaintiff produced evidence showing that Townsend had personally written to her on or about August 24, 1998 commending the "excellent legal services [Plaintiff] provided in support of the Navy." Ex. "D" to Plt.s' CSF. Thus, there is evidence to support that Townsend, at least as of 1998, did not regard Plaintiff's performance as deficient. Also, that CO Caldwell gave Plaintiff a positive review stating on or about July 21, 1999 "I most strongly recommend Ms. Rivera for additional recognition to highlight her invaluable service to the Navy and the nation," Ex. E to Plt.'s CSF, contradicts Defendant's assertion that CO Caldwell [19] did not support her GS–15 candidacy. Also problematic with

---

**18.** To the extent that Defendant argues that Plaintiff's statistics are not relevant because the individuals who were promoted were not similarly situated, *see Patterson,* 1995 WL 871333 *3 ("plaintiff's statistics do not compare those employees who are similarly situated"), as discussed below, whether or not Plaintiff was/is similarly situated with those persons who received promotions is a disputed question of fact.

**19.** The parties represented at the hearing that they have not been able to locate CO Caldwell for deposition/questioning regarding this matter. The most recent statement by CO Caldwell regarding Rivera's performance as Counsel presently before the Court is the July 21, 1999 letter quoted above. *See* Ex. E. to Plt.'s CSF.

respect to Defendant's argument that the various Counsel promoted to GS–15 did not have negative evaluations is the fact that many of the negative evaluations and comments regarding Plaintiff's performance relied on by Defendant were generated by Rossiter after Plaintiff filed her EEO Complaint on April 24, 2001 and after Defendant denied Plaintiff's promotion request (from May 1, 2000 to March 15, 2001). *See, e.g.,* Ex. E (July 2000 to June 2001 evaluation dated 1/11/02) to Def.'s CSF, Ex. F (Additional Feedback Letter dated 1/10/02) to Def.'s CSF, Ex. G (Letter of Caution dated 1/10/02) to Def.'s CSF. Additionally, Plaintiff produced evidence that at least numerically indicates that she carried a workload in 2000 and 2001 comparable to, if not more burdensome than, other NAVSUP Counsel who received promotions. *See* Rivera Decl. ¶ 39. A reasonable trier of fact could infer based on these contradictions, as well as the absence of a written statement by CO Caldwell providing reasons for why she did not support Plaintiff's promotion and the glowing praise bestowed on Plaintiff by CO Nanney, that Defendant's reliance on CO Caldwell's lack of support and the other legitimate reasons proffered by the Navy were pretextual.

Accordingly, the Court denies Defendant's Motion for Summary Judgment on Plaintiff's claim for failure to promote based on race (Filipino) and sex (female).

## B. *Retaliation*

The prima facie case that a complainant must establish to set forth a claim for retaliation is well established. Plaintiff must show that (s)he (1) engaged in a protected activity, (2) suffered an adverse employment decision, and (3) that there is a causal link between plaintiff's activity and the employment decision. *Lyons,* 307 F.3d at 1118.

The parties do not dispute that Plaintiff engaged in protected activity when she initially met with an EEO counselor regarding her discrimination claims on April 24, 2001 ("EEO grievance"). *See* Reply at 17. Defendant argues, however, that Plaintiff's July 2000 to June 2001 performance review, the Additional Feedback Letter and the Letter of Caution do not constitute adverse employment actions. *See* Def.'s Mot. at 24–28. Plaintiff, on the other hand, argues that her retaliation claim is sustainable based on (1) the Additional Feedback Letter and Letter of Caution,[20] (2) removal of her supervisory authority, and (3) increased supervision. *See* Plt.'s Opp. at 21–24.

### 1. Additional Feedback Letter, Letter of Caution and July 2000 to June 2001 Evaluation

Plaintiff relies on *Yartzoff v. Thomas,* 809 F.2d 1371 (9th Cir.1987), in support of her argument that the Additional Feedback Letter, Letter of Caution (collectively, the "Letters"), and the July 2000 to June 2001 evaluation, constitute "adverse employment decisions." In *Yartzoff,* the Ninth Circuit held that "undeserved performance ratings, if proven, would constitute 'adverse employment decisions' cognizable under this section." *Id.* at 1376. Defendant, on the other hand, contends that the Letters are more akin to the performance evaluations in *Lyons* and *Kortan* that were held not to rise to the level of an adverse employment action.

**20.** The Court notes that Plaintiff did not specifically argue in her Opposition that the July 2000 to June 2001 performance review constitutes "adverse employment action." However, in her Declaration, Plaintiff states "Michael Rossiter engaged in retaliation when he ... gave me negative evaluations and issued a Letter of Caution." Thus, the Court construes Plaintiff's arguments regarding the Additional Feedback Letter and Letter of Caution as inclusive of the July 2000 to June 2001 evaluation.

Defendant also argues that the "letters clearly state that they are not disciplinary actions and that (unlike a disciplinary action or official performance evaluations) will not be filed in her official personnel folder." Def.'s Reply at 18.

In *Lyons,* the complainant alleged that the defendant retaliated against him by "awarding him a performance evaluation of [an average] 'fully successful' on two separate occasions." 307 F.3d at 1118. The Ninth Circuit held that the evaluations did not "rise to the level of an adverse employment action by an employer" reasoning:

> In *Kortan v. California Youth Authority,* 217 F.3d 1104 (9th Cir.2000), we held that a performance evaluation that was mediocre (rather than 'sub-average') and that did not give rise to any further negative employment action did not violate Title VII. Tate does not allege that NADNI management has either relied upon the 'fully successful' evaluations in making a further employment decision adverse to Tate or published these evaluations by making them available to other potential employers. Furthermore, Tate does not allege that his mediocre evaluations were accompanied by any meaningful change in work assignments, either in the form of relieving him of responsibilities or saddling him with additional burdensome tasks.

*Id.*

The Court finds that the July 2000 to June 2001 evaluation and Additional Feedback Letter constitute adverse employment decisions. The July 2000 to June 2001 evaluation, issued by Rossiter on February 11, 2002, contains negative comments that are beyond "mediocre." *See* Ex. E to Def.'s CSF ("[M]any areas of your performance were marginal, at best.... Your approach to delivery of le-

gal services has been reactive, rather than proactive."). The comments contained in the Additional Feedback Letter are significantly more negative. *See* Ex. F to Def.'s CSF ("Your professional relationships with your clients, coworkers and superiors were deficient." "The advice you provided in several instances reflected poor legal judgment, and not the level of the quality expected of a GS–14."). Thus, both the evaluation and the letter are distinguishable from the "mediocre" evaluations in *Kortan* and *Lyons,* as it indicates performance below "sub-average." Furthermore, the Court presumes that Plaintiff's July 2000 to June 2001 performance evaluation is included in her personnel file given that Defendant has not indicated otherwise. Similarly, the Additional Feedback Letter, which is tied to the July 2000 to June 2001 evaluation, does not indicate on its face that it will not be placed in Plaintiff's file.[21] *See* Ex. F to Def.'s CSF. Thus, the Court finds that the rule established in *Yartzoff*—that "undeserved performance ratings, if proven, would constitute adverse employment decisions"—applies with respect to the July 2000 to June 2001 evaluation and the Additional Feedback Letter.

As for the Letter of Caution, however, Rossiter specifically indicates that it will not be filed in Plaintiff's official personnel folder, though it will be retained in the office file. *See* Ex. G to Def.'s CSF ("This is not a disciplinary action. It will not be filed in your official personnel folder, but will be retained in office files."). Notably, Plaintiff does not contest this representation. It makes sense that a letter or evaluation containing negative comments not retained in an employee's file should not constitute an adverse employment decision. *See Alexander v. Principi,* 16 Fed.Appx. 755, 758, 2001 WL 894285

---

21. Defendant cites no evidence in support of its contention that the Additional Feedback Letter will not be placed in Rivera's personnel file. *See* Def.'s Reply at 18.

(9th Cir.2001) (citing *Kortan* for the proposition that a "negative evaluation that does not remain in the employee's file is not an adverse employment action").[22] Accordingly, the Court finds that Plaintiff's claim for retaliation cannot be sustained based on the Letter of Caution.

### 2. Removal of Supervisory Duties and Increased Supervision

While Plaintiff argues in her Opposition that her claims for retaliation are sustainable based on removal of her supervisory duties and increased supervision, she did not allege these claims in her November 6, 2001 or June 12, 2002 Formal Complaints of Discrimination, or in the Complaint. *See* Exs. A and C to Def.'s CSF, Compl. Plaintiff alleged "[r]emoval in July 2000 of [her] supervisory duties over Assistant Counsel who worked in the office headed by Plaintiff" as a specific act of discrimination, not retaliation, in her November 6, 2001 Formal Complaint of Discrimination, *see* Compl. ¶ 23, a claim that she now concedes as untimely. *See* Opp. at 6. Plaintiff's June 12, 2002 Formal Complaint of Discrimination does not allege retaliation based on removal of Plaintiff's supervisory duties or increased supervision.

■■■ Even if Plaintiff had properly alleged this claim, the Court finds, as a matter of law, that the removal of Plaintiff's supervisory duties and increased supervision which allegedly took place in July of 2000 with the hiring of Chang, do not sustain a claim for retaliation. As Defendant points out, Plaintiff first initiated contact with an EEO Counselor on or about April 24, 2001. The alleged acts of retaliation, according to Plaintiff, occurred nearly a year prior to the "protected activity." Plaintiff fails to meet the third prong of the prima facie case requiring a causal link with respect these allegations of retaliation.

### CONCLUSION

The Court GRANTS IN PART AND DENIES IN PART Defendant's Motion to Dismiss for Failure to Timely Exhaust Administrative Remedies and Motion for Summary Judgment. First, the Court dismisses Plaintiff's claims for discrimination based on (1) Plaintiff's July 1998 to July 1999 evaluation and (2) Plaintiff's removal of her supervisory duties in July 2000 and (3) Plaintiff's July 1999 to June 2000 evaluation. Plaintiff concedes that the events listed in (1) and (2) occurred outside the 45-day limitation period set forth in 29 C.F.R. 1614.105(a)(1). The Court dismisses Plaintiff's claim for discrimination based on Plaintiff's July 1999 to June 2000 evaluation given that the underlying "matter alleged to be discriminatory" occurred no later than February 2, 2001, the date that Plaintiff received the evaluation.

Second, the Court DENIES Defendant's Motion for Summary Judgment on Plaintiff's claim for failure to promote on the basis of race and sex. The Court finds that Plaintiff has met her burden of setting forth a prima facie case of race- and sex-based discrimination and has produced evidence to show the existence of genuine issues of material fact with respect to whether Defendant's proffered legitimate non-discriminatory reason is pretextual.

Third, the Court GRANTS Defendant's Motion for Summary Judgment on Plaintiff's claims for discrimination based on her June 2000 to July 2001 performance evaluation, the Additional Feedback Letter and the Letter of Caution. Plaintiff did not argue or present evidence that these matters supported claims for race- or sex-

---

**22.** The Court notes that it is not relying on this unpublished decision, pursuant to U.S.Ct. of App. 9th Cir. Rule 36–3.

based discrimination, but rather asserted that they constituted retaliation.

Fourth, the Court GRANTS Defendant's Motion for Summary Judgment on Plaintiff's retaliation claim based on the Letter of Caution but DENIES the same as to the Additional Feedback Letter and the July 2000 to June 2001 evaluation. While Rossiter explicitly states that the Letter of Caution will not be placed in Plaintiff's employment file, the Additional Feedback Letter, which appears to supplement Plaintiff's July 1999 to June 2000 performance evaluation, does not contain a similar statement. Finally, there is no indication that the July 2000 to June 2001 evaluation will not be placed in Plaintiff's personnel file.

Last, the Court GRANTS Defendant's Motion for Summary Judgment on Plaintiff's claim for retaliation based on (1) removal of Plaintiff's supervisory duties over Associate Counsel and (2) increased supervision. Plaintiff did not allege these retaliation claims in the either the November 6, 2001 or June 12, 2002 Formal Complaint of Discrimination or in the Complaint. Furthermore, the Court finds that Plaintiff fails to establish the third prong (causal link) of the prima facie case for retaliation given that the acts alleged to be retaliatory occurred nearly one year before Plaintiff first contacted an EEO Counselor.

IT IS SO ORDERED.